THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| CLOUDCOVER IP, LLC, a Minnesota limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>SCOTT BUCHANAN, an individual,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER DENYING [37] DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:21-cv-00237-DBB-JCB<br><br>District Judge David Barlow |

Plaintiff Cloudcover IP, LLC ("CloudCover") filed its Complaint against Defendant Scott Buchanan ("Mr. Buchanan") under the federal Anticybersquatting Consumer Protection Act ("ACPA") and Utah's comparable cybersquatting law.[1] The matter before the court is Mr. Buchanan's Motion for Summary Judgment.[2] After reviewing the briefing and relevant law, the court finds that oral argument is unnecessary.[3] For the reasons below, the court denies the motion for summary judgment.

## BACKGROUND

CloudCover was founded in 2003 and incorporated in 2009.[4] It describes itself as an intellectual property ("IP") holding company that licenses its IP to a related entity CloudCover, Ltd.[5] In 2011 and 2018, respectively, it obtained federal trademarks for "CloudCover" and

---

[1] Compl., ECF No. 2, filed Apr. 16, 2021.
[2] Def. Mot. for Summ. J. ("MSJ"), ECF No. 37, filed Oct. 14, 2022.
[3] *See* DUCivR 7-1(g).
[4] Compl. ¶¶ 5, 13; CloudCover Bus. R., ECF No. 37-2, filed Oct. 14, 2022.
[5] Compl. ¶ 7; Cardot Dep. 65:4–16; 67:1–9, ECF No. 37-7, filed Oct. 14, 2022.

"CLOUDCOVER."[6] The marks were for "underwriting digital risk insurance to monitor value of internet transmitted data," "[c]onsulting services in the field of digital risk management[,]" and [d]esign of computer software used to monitor digital risk management."[7]

Mr. Buchanan registered the "cloudcover.com" domain name in 2002.[8] He stated that he registered it to launch a software-as-a-service project with his brother.[9] The business purportedly would offer software related to lending services and mortgages.[10] Though he was unable to offer an exact launch date, Mr. Buchanan estimated that he would start the business by 2025.[11] He explained that the project's delay was due to his brother's poor health but that his brother was still interested in the project as of 2022.[12] Prior to litigating the instant action, Mr. Buchanan had spent $3,746 in expenses related to the domain.[13]

**The "cloudcover.com" Domain**

From late-2002 until 2005, the "cloudcover.com" domain showed a generic parking page created by the now-defunct Internet registrar, Netster.[14] The term "parking page" refers to "a

---

[6] U.S. Patent No. 4,045,622 (filed Oct. 25, 2011), ECF No. 37-3, filed Oct. 14, 2022; U.S. Patent No. 5,586,579 (filed Oct. 16, 2018), ECF No. 37-3, filed Oct. 14, 2022.
[7] U.S. Patent No. 4,045,622; U.S. Patent No. 5,586,579.
[8] Buchanan Dep. 19:21–23, ECF No. 37-1, filed Oct. 14, 2022.
[9] *Id.* at 23:24–24:4.
[10] *Id.* at 20:14–22:11, 23:16–24:3.
[11] *Id.* at 42:9–19.
[12] *Id.* at 24:5–25:16; 33:6–18.
[13] *Id.* at 5:3–19.
[14] *See* Ex. F, Decl. of Aaron P. Minster ("Minster Decl."), ECF No. 40-1, filed Nov. 14, 2022. Mr. Buchanan objects to the admissibility of Exhibit F because there are no "indicia permitting authentication of its veracity such as when it was printed, obtained or visited, where it was obtained, or what URL was entered when it was obtained." Reply Mem. in Support of Def. Mot. for Summ. J. ("Reply") 3–4, ECF No. 41, filed Nov. 28, 2022. "[T]he content or substance of the evidence must be admissible" for the court to consider it. *Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016), *as amended on reh'g* (Nov. 8, 2016) (quoting *Trevizo v. Adams*, 455 F.3d 1155, 1160 (10th Cir. 2006)). However, "[e]ven without authentication through an affidavit or deposition, a document may be authenticated by circumstantial evidence which suggests the document is what it purports to be." *Tanner v. McMurray*, 429 F. Supp. 3d 1047, 1129 n.165 (D.N.M. 2019), *rev'd in part, vacated in part on other grounds*, 989 F.3d 860 (10th Cir. 2021). CloudCover's counsel avers that Exhibit F consists of "true and correct copies of the Wayback Machine printouts for cloudcover.com as well as printouts from the cloudcover.com website." Minster

domain name that resolves to a website containing advertising listings and links."[15] Between 2005 and early-2014, the "cloudcover.com" domain displayed no data.[16] Starting in late-2014, the domain contained links to sites related to the term "cloudcover" such as "Cloud Computing," "Cloud Servers," "Cloud Applications," "Cloud Accounts," "Cloud Accounting," and "Cloud Data."[17] Along with the links, a December 16, 2014 screen capture shows fine print stating that the site's domain owner was participating in the Sedo Domain Parking service.[18]

The Sedo domain parking service allows "users to 'park' their domain names in order to increase the chance of a sale and to generate" revenue.[19] The general process is as follows. A user forwards his domain name to a specified server and Sedo generates links "to the website of an advertiser interested in domain traffic related to the category of [the user's] domain."[20] A site managed by Sedo applies Google AdSense, which uses algorithms to "select[] advertising links on the parked page so that they match the domain name of the respective parked website."[21] When a user clicks on a parking page link, the user "will be directed to a 'results page' that will display a new group of . . . results relevant to the related link or search term."[22]

---

Decl. 2. The images are discussed at length in CloudCover's opposition brief. Exhibit F includes a calendar-view printout showing the time periods that the Wayback Machine captured images for cloudcover.com. The remainder of the exhibit's pages are screenshots from Sedo.com that explain domain parking and its privacy policy, and screenshots from cloudcover.com and netster.com. The pages correspond to discussions of the screenshots in the parties' depositions. *See generally* Buchanan Dep.; Cardot Dep. Given the websites' content, the context in which they are discussed, and the reasons for which they are proffered, the court will consider Exhibit F as authentic for purposes of the instant motion.

[15] *True Value Co. v. Hills*, No. 16-00237, 2016 WL 7191540, at *2 (D. Haw. Nov. 16, 2016), *R. & R. adopted*, No. 16-00237, 2016 WL 7191562 (D. Haw. Dec. 12, 2016).
[16] *See* Ex. F, Minster Decl.
[17] *See id.*
[18] CLD000216, Ex. F, Minster Decl.
[19] CLD000205, Ex. F, Minster Decl.
[20] *Id.*
[21] CLD000212, Ex. F, Minster Decl.
[22] *Id.*

**Offers to Buy the "cloudcover.com" Domain**

In December 2010, CloudCover's attorney contacted Mr. Buchanan. The attorney explained that Cloudcover had owned the "CloudCover" mark since 2007 and Mr. Buchanan's possession of the "cloudcover.com" domain was an infringement.[23] CloudCover offered payment and equity for transfer of the domain name.[24] Mr. Buchanan responded that he had bought the domain before CloudCover's interest in the matter and that he was not inclined to sell.[25] Two months later, CloudCover sent another email, stating that if Mr. Buchanan did not cooperate, the alternative was an action for trademark infringement.[26]

A domain broker hired by CloudCover called Mr. Buchanan to discuss selling the "cloudcover.com" domain in early 2016. Mr. Buchanan said that it was possible that he made a statement to this effect: that "others have tried to high-jack [sic] the domain away from [him] over the years . . . [and so there have been] expenses invested into it, which off the top of his head, he estimates was more than $20,000."[27] Mr. Buchanan described the conversation with the broker as a short call where he was "asked . . . a simple question and [he] probably responded with a round number, not for sale, but maybe what maybe [he] had spent in protecting [his] ownership in the domain name."[28] When asked if he had considered selling the domain name, he

---

[23] Email from David E. Albright of Dec. 24, 2010 ("Albright Email"), Ex. D, ECF No. 37-4, filed Oct. 14, 2022.
[24] *Id.*
[25] Email from Scott Buchanan of Dec. 24, 2010 ("Buchanan Email"), Ex. E, ECF No. 37-5, filed Oct. 14, 2022.
[26] *See* Letter from Corporate Legal Counsel of Feb. 5, 2011, Ex. F, ECF No. 37-6, filed Oct. 14, 2022.
[27] Buchanan Dep. 29:24–30:10. Mr. Buchanan argues that the email referring to the instant conversation is inadmissible hearsay. Reply 4. The court need not address this matter since the facts cited here come from Mr. Buchanan's deposition testimony. *See* Buchanan Dep. 28:12–33:2.
[28] Buchanan Dep. 31:24–32:4.

said that he did not know.[29] From 2013 to 2020, Mr. Buchanan received seven other offers for the domain name ranging from $351 to $100,000.[30]

**Arbitration**

CloudCover filed an arbitration complaint under the Uniform Domain-Name Dispute-Resolution Policy ("UDRP") against Mr. Buchanan in April 2016. Seeking transferral of the "cloudcover.com" domain,[31] it argued that Mr. Buchanan had "engaged in bad faith registration and use of the domain name"; "[he] ha[d] offered to sell the disputed domain name in excess of out-of-pocket expenses"; and "[he] use[d] the disputed domain to resolve to a domain parking page."[32] Mr. Buchanan responded to the complaint in May 2016.[33]

The arbitration panel denied CloudCover relief.[34] It found that Mr. Buchanan's domain name was identical to the "CLOUDCOVER" mark, that CloudCover had rights in the mark, and that the domain name was not registered.[35] Despite these findings, the panel concluded that Mr. Buchanan had not been using the mark in bad faith.[36] The panel reasoned that the "cloudcover.com" domain was registered before any date that Cloudcover could have relied upon

---

[29] *Id.* at 32:21–33:2.
[30] In June 2013, Mr. Buchanan invited a party to make an offer after the party expressed an interest in the "cloudcover.com" domain. Ex. J, Minster Decl. The party offered $1,000. Ex. K, Minster Decl. In October 2014, after Mr. Buchanan invited another party to make an offer, the party offered $500. Ex. H, Minster Decl. Mr. Buchanan responded that the offer was "not anywhere close to what we've invested in the domain and project." Ex. K, Minster Decl. The potential buyer then offered $10,000, and later asked if, $25,000, $50,000, or $100,000 was high enough. Ex. I, Minster Decl. In February 2016, Mr. Buchanan received an inquiry after a party noticed that the domain was not in use. Ex. M, Minster Decl. After Mr. Buchanan invited an offer, the party offered $500. Ex. M, Minster Decl. Mr. Buchanan rejected an offer from a domain broker, stating that "the domain is not up for sale. Even if it were, we've invested tens of thousands of dollar [sic] securing it and protecting it for our use." Ex. N, Minster Decl. Most recently, Mr. Buchanan received a $50,000 offer from a broker in January 2022. Ex. P, Minster Decl.
[31] *See* UDRP Compl., *Cloudcover IP, LLC v. Buchanan*, Ex. K, ECF No. 37-11, filed Oct. 14, 2022.
[32] *Id.* at 5.
[33] UDRP Resp., *Cloudcover IP, LLC v. Buchanan*, Ex. L, ECF No. 37-12, filed Oct. 14, 2022.
[34] UDRP Decision 10, *Cloudcover IP, LLC v. Buchanan*, Ex. M, ECF No. 37-13, filed Oct. 14, 2022.
[35] *Id.* at 6.
[36] *Id.*

to establish rights.[37] The panel found no evidence that Mr. Buchanan was aware of Cloudcover at the time that he registered the domain name, or that he had registered it to sell to another party.[38] Last, the panel noted that Mr. Buchanan had offered evidence to negate the accusation—his purported use of the domain name to launch a future project.[39]

**Procedural Posture**

Cloudcover filed its Complaint on April 16, 2021.[40] Mr. Buchanan moved to dismiss the Complaint for failure to state a claim in May 2021.[41] The court denied the motion.[42] On October 14, 2022, Mr. Buchanan moved for summary judgment.[43] CloudCover responded on November 14, 2022,[44] and Mr. Buchanan filed a reply on November 28, 2022.[45]

## STANDARD

A party is entitled to summary judgment only if it is able to show that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[46] A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[47] A fact is material if it "might affect the outcome of the suit under the governing law."[48] The court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the motion.'"[49]

---

[37] *Id.* at 8.
[38] *Id.*
[39] *Id.*
[40] Compl.
[41] ECF No. 15.
[42] ECF No. 31.
[43] ECF No. 37.
[44] Mem. of Law in Opp'n to Def. Mot. for Summ. J. ("Opp'n"), ECF No. 39, filed Nov. 14, 2022.
[45] Reply.
[46] Fed. R. Civ. P. 56(a).
[47] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).
[48] *Id.*
[49] *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654 (1962)).

# DISCUSSION

## I. The Anti-Cybersquatting Consumer Protection Act

At issue is the ACPA[50] and Utah's anti-cybersquatting law.[51] Both statutes have nearly identical language.[52] While Utah courts have not interpreted the state's cybersquatting statute, the Utah Legislature has directed that the state statute "shall be interpreted to provide for the registration and protection of trademarks and service marks in a manner substantially consistent with the federal system of trademark registration and protection under the Trademark Act of 1946."[53] Thus, the court treats the two statutes as identical for purposes of the instant motion.

"Congress enacted the [ACPA] . . . to address 'a new form of piracy on the Internet caused by acts of "cybersquatting," which refers to the deliberate, bad faith, and abusive registration of Internet domain names in violation of the rights of trademark owners.'"[54] One is liable under the ACPA if they "register[], traffic[] in, or use[] a domain name that is identical or confusingly similar to a distinctive mark, with a bad faith intent to profit from that mark."[55] To succeed on its claims, CloudCover must prove "(1) that its trademark, [CloudCover], was distinctive at the time of registration of the domain name, (2) that the domain names registered by [Mr. Buchanan], including [cloudcover.com], are identical or confusingly similar to the trademark, and (3) that [Mr. Buchanan] used or registered the domain name with a bad faith intent to profit" from CloudCover's mark.[56]

---

[50] 15 U.S.C. § 1125(d).
[51] Utah Code Ann. § 70-3a-309 (West 2010).
[52] *Compare* 15 U.S.C.§ 1125(d), *with* Utah Code Ann. § 70-3a-309 (West 2010).
[53] Utah Code Ann. § 70-3a-102(1).
[54] *Utah Lighthouse Ministry v. Found. for Apologetic Info. & Rsch.*, 527 F.3d 1045, 1057 (10th Cir. 2008) (quoting S. Rep. No. 106-140, at 4 (1999)).
[55] *Id.*
[56] *Id.*; *see* 15 U.S.C. § 1125(d)(1)(A).

## II. Bad Faith Intent to Profit from CloudCover's Mark

Mr. Buchanan addresses only the third ACPA element, bad faith intent to profit, in his motion for summary judgment.[57] The court thus analyzes whether a reasonable fact-finder could determine that Mr. Buchanan has shown a bad faith intent to profit from CloudCover's mark. To this end, the statute offers nine non-exhaustive factors.[58] "[T]here is no simple formula for evaluating and weighing these factors."[59] "The ACPA allows a court to view the totality of the circumstances in making the bad faith determination . . . that means looking at the purely circumstantial indicia of bad faith[.]"[60] "The central question is simply 'whether or not the [alleged cybersquatter] registered, trafficked in, or used the domain name with a bad faith intent to profit from the goodwill of the mark of another.'"[61]

### A. Registration of the Domain Name

Mr. Buchanan claims that his registration of the domain name in 2002, nine years before CloudCover's use of the mark, shows that he did not have bad faith intent in procuring the domain.[62] He also states that he was not aware of any existing mark in "CloudCover" when he

---

[57] Mr. Buchanan does not address the first or second ACPA elements. *See* Def. MSJ 14 ("[T]he key question here that CloudCover must show is Buchanan's bad-faith intent to profit from CloudCover's trademark."). While Plaintiffs do so in their opposition, *see* Opp'n 12–17, they did not move for summary judgment on these issues and the deadline for dispositive motions has expired, *see* ECF No. 36. Should the court rule on the first two ACPA elements, it would effectively be an advisory opinion. *See Byrum v. Off. of Pers. Mgmt.*, 618 F.3d 1323, 1331 (Fed. Cir. 2010) ("We decline the [party]'s invitation to offer an advisory opinion on such matters, especially when they . . . have not been satisfactorily briefed by the parties."). Thus, the court decides this motion based on the only ACPA element raised by the motion, bad faith intent to profit, and does not address the first two ACPA elements.
[58] 15 U.S.C. § 1125(d)(1)(B)(i); *see Morrison & Foerster, LLP v. Wick*, 94 F. Supp. 2d 1125, 1131 (D. Colo. 2000) (internal citation omitted) (The factors "are not framed as exclusive or mandatory, but are relevant guidelines."); *see also Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.*, 202 F.3d 489, 498 (2d Cir. 2000) ("[W]e are not limited to considering just the listed factors when making our determination of whether the statutory criterion has been met.").
[59] *Lamparello v. Falwell*, 420 F.3d 309, 319 (4th Cir. 2005) (citation omitted).
[60] *Newport News Holdings Corp. v. Virtual City Vision, Inc.*, 650 F.3d 423, 435 (4th Cir. 2011), *cert. denied*, 132 S. Ct. 575 (2011) (citation omitted).
[61] *Prudential Ins. Co. of Am. v. PRU.COM*, 546 F. Supp. 3d 478, 785 (E.D. Va. 2021).
[62] MSJ 14–15.

registered the domain. For its part, CloudCover contends that Mr. Buchanan's re-registrations of the "cloudcover.com" domain are sufficient proof of a bad faith intent to seek profit.

There are several undisputed facts that go to whether Mr. Buchanan had bad faith intent regarding his use of the "cloudcover.com" domain. He first registered the domain name in 2002.[63] CloudCover would not file for the "CloudCover" mark until 2007, and it did not receive the mark until 2011.[64] In December 2010, CloudCover's counsel informed Mr. Buchanan of its trademark.[65] Mr. Buchanan never sought registration for any "cloudcover"-related mark.[66] Instead, he re-registered the domain name four times: October 2010, November 2015, December 2020, and November 2021, while failing to take any concrete steps to apply the domain toward a bona fide purpose.[67] Indeed, three re-registrations occurred while Mr. Buchanan was getting offers for the sale of cloudcover.com—including a 2020 offer for $100,000.[68] Given the re-registrations, a reasonable fact-finder could infer a bad faith intent.

The court next addresses the fifth and sixth ACPA factors: an intent to divert users from CloudCover's site for financial gain, and an offer to sell the domain for profit.

B.  **Intent to Divert Consumers**

For the fifth ACPA factor, CloudCover must identify a triable issue of fact whether Mr. Buchanan intended to divert consumers from CloudCover's sites by showing a likelihood of

---

[63] Buchanan Dep. 19:21–23.
[64] U.S. Patent No. 4,045,622.
[65] Albright Email.
[66] Buchanan Dep. 26:4–7, 73:19–74:3.
[67] Account Settings, Ex. L, Minster Decl.
[68] *See* Exs. G, H, I, J, K, M, Minster Decl.

confusion as to the "source, sponsorship, affiliation, or endorsement" of the "cloudcover.com" domain, either for financial gain or with the purpose to cheapen the mark.[69]

Mr. Buchanan argues that CloudCover has offered no evidence showing a likelihood of confusion or that he received income from the parking service.[70] He contends that CloudCover fails to offer evidence that "a single webpage displayed on cloudcover.com is or ever was linked to any third-party site that would be confusing with CloudCover's trademark."[71] He states that he was unaware of how Sedo's domain parking service appeared on cloudcover.com: he did not set up the Sedo parking page, has no credentials for a Sedo site, and he had no familiarity with it before the instant litigation.[72] Mr. Buchanan avers that he did not remember whether he had an option for customizing the page at registration.[73] And he stated that he has never been involved in choosing the site's content.[74] What's more, he claims that "domain 'parking' pages can, in some instances, be displayed by domain registrars without the owner/registrant's involvement."[75] Last, he declares that he never received income from the "cloudcover.com" domain.[76]

In response, CloudCover argues that Mr. Buchanan intended to use Sedo's domain parking services for profit. It cites the fact that starting in late-2014, cloudcover.com showed a Sedo Domain Parking page with small print stating that the webpage was generated by the

---

[69] 15 U.S.C. § 1125(d)(1)(B)(i)(5); *see Utah Lighthouse Ministry, Inc. v. Discovery Computing, Inc.*, 506 F. Supp. 2d 889, 900 (D. Utah 2007).
[70] MSJ 11, 17; Buchanan Dep. 18:19–24; 36:24–37:23; 71:11–18; 72:7–16.
[71] MSJ 17.
[72] Buchanan Dep. 12:4–11; 14:1–16:16; 17:9–19:11; 37:13–23.
[73] *Id.* at 47:4–8.
[74] *Id.* at 71:11–18.
[75] MSJ 20 (quoting Compl. ¶ 23).
[76] Buchanan Dep. 72:10–16.

domain owner using Sedo's Domain Parking.[77] CloudCover then points to the purpose of domain parking and how Sedo uses algorithms to select advertising links.[78]

CloudCover also contends that Mr. Buchanan's inconsistencies and instances of professed ignorance show bad faith. It points to a discrepancy over Mr. Buchanan's familiarity with Sedo. Mr. Buchanan discussed in his 2016 UDRP response how Sedo's domain parking service could satisfy the "*bona* fide offering of goods or services,"[79] yet he stated in his 2022 deposition that he had become familiar with Sedo sometime in 2021.[80] Next, CloudCover explains that when faced with the cloudcover.com printout showing the presence of Sedo Domain Parking, Mr. Buchanan claimed that he was "unaware of any items that were going on . . . the actual domain" and that he did not believe that he had "kept track of the content that was being served on the domain cloudcover.com."[81] In essence, CloudCover questions Mr. Buchanan's averments that the Sedo parking site was initiated without his knowledge,[82] that he could not find Sedo settings on the registrar's page,[83] and that he had not taken any steps to remove the Sedo parking service or investigate how to do so.[84]

Considering the evidence, CloudCover has not identified a triable issue of fact as to whether Mr. Buchanan intended to divert consumers. Cloudcover relies chiefly on the Sedo Domain Parking page. This type of parking page is designed to generate revenue for the domain holder based on the number of arriving visitors who click on links that match the site's domain

---

[77] Ex. F, Minster Decl.
[78] CLD000205, 212, Ex. F, Minster Decl.
[79] CLD000048, Ex. L, ECF No. 37-12.
[80] *See* Buchanan Dep. 12:4–15.
[81] *Id.* at 13:17–20; 16:3–10.
[82] *Id.* at 15:15–16:16.
[83] Opp'n 29 (citing Buchanan Dep. 36:13–40:5).
[84] Buchanan Dep. 18:25–19:11.

name.[85] Visitors who wanted to visit CloudCover ostensibly would arrive at cloudcover.com and click on a hyperlink having words associated with "CloudCover." The domain name and the third-party links might be similar enough to the trademark to create confusion. But there is no testimony to show actual or likely confusion between linked third-party websites and CloudCover's sites.

But even if the "cloudcover.com" domain containing the Sedo Domain Parking page had enough similarities to CloudCover's sites to satisfy the fifth factor, CloudCover fails to offer sufficient evidence connecting Mr. Buchanan to Sedo.[86] Mr. Buchanan denies any connection to the Sedo Domain Parking page. He set up the "cloudcover.com" domain in 2002—twelve years before the purported appearance of the Sedo page and eight years before receiving communications from CloudCover. He avers that he has no knowledge as to how the Sedo page appeared on his domain or how to adjust or remove associated information. More importantly, Mr. Buchanan denies having received money from Sedo.

CloudCover has not shown otherwise. There may be a discrepancy as to when Mr. Buchanan first knew that the Sedo Domain Parking page appeared on the "cloudcover.com" domain. Yet this discrepancy is not enough to create a presumption of a bad faith intent. A webpage with small print stating that the "page is provided to the domain owner free by Sedo's Domain Parking" does not show that Mr. Buchanan arranged for Sedo to create a domain parking site or that he profited from it. CloudCover's doubts as to Mr. Buchanan's truthfulness are insufficient to demonstrate that he was profiting from Sedo.

---

[85] *See* CLD000205, 212, Ex. F, Minster Decl.
[86] *See Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) ("[T]he movant need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.").

For these reasons, CloudCover fails to show that Mr. Buchanan intended to divert consumers from CloudCover's websites under the fifth ACPA factor.

### C. Intent to Profit from the "cloudcover.com" Domain

The sixth ACPA factor has two elements: (1) a party offers to sell, transfer, or otherwise assign a domain to the mark owner or a third party for profit; and (2) that party has no intent to use the domain in a bona fide offering of goods or services.[87] Mr. Buchanan argues that there is no evidence as to either element. In his deposition, he averred that he has never offered the domain for sale that he could recall,[88] that he has never received income from the domain name, and that he has never inquired as to whether he could receive income.[89] He asserts instead that he has a bona fide reason for maintaining the domain: he and his brother planned to use the domain to offer software for lending services related to mortgages.[90] To that end, he states that his plans for the project have not changed since 2002.[91]

As to the offers to buy the "cloudcover.com" domain, Mr. Buchanan contends that the exchanges did "not rise to the level of an offer . . . to sell the domain name . . . for financial gain."[92] He says that he told the 2016 domain broker interested in buying cloudcover.com only that offers would have to be higher than $20,000.[93] But he claims that he never actually offered to sell the domain—only a willingness to "entertain [third-party] offers when contacted."[94]

---

[87] 15 U.S.C. § 1125(d)(1)(B)(i)(VI).
[88] Buchanan Dep. 72:17–19.
[89] *Id.* at 72:7–16.
[90] *Id.* at 20:14–22:11; 23:16–23.
[91] *Id.* at 24:5–25:16; 26:8–27:19; 33:6–18.
[92] MSJ 18.
[93] *Id.*
[94] Reply 12.

CloudCover asserts that the sixth ACPA factor weighs in favor of showing Mr. Buchanan's bad faith intent to profit because his software-as-a-service project is a pretense. First, CloudCover characterizes Mr. Buchanan's testimony as self-serving and bereft of corroboration. It points to Mr. Buchanan's vague descriptions of the project and his overall lack of progress.[95] CloudCover urges the court to discount Mr. Buchanan's testimony because "'self-serving testimony' of intent is often no more than argument masquerading as testimony, and it adds little to the intent inquiry."[96] As a result, CloudCover argues that summary judgment is inappropriate because Buchanan's credibility can be tested only on cross-examination.[97]

Next, CloudCover contends that there is no requirement that a cybersquatter make a formal offer to sell.[98] It argues that Mr. Buchanan, "recognizing the value inherent in the "cloudcover.com" domain name, [wa]s attempting to secure its sale at a price that far exceeds anything he has invested in the domain."[99] It also highlights that Mr. Buchanan represented to potential buyers that he had spent far more on the domain than what he had actually paid.[100] CloudCover argues that Mr. Buchanan's maintenance of cloudcover.com after he knew about the trademarks, while third parties bid up the price, showed his intent to profit.[101]

There is a triable issue of fact as to whether Mr. Buchanan offered to sell cloudcover.com for profit with no bona fide plan to use the domain name. The lack of an explicit offer to sell cloudcover.com is not fatal. "[M]any cybersquatters are now careful to no longer offer the

---

[95] Opp'n 22–23.
[96] *Id.* at 24 (quoting *J-B Weld Co., LLC v. Gorilla Glue Co.*, 978 F.3d 778, 792 (11th Cir. 2020)).
[97] *Id.* (citing *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1265–66 (5th Cir. 1991)).
[98] *Prudential Ins.*, 546 F. Supp. 3d at 489 (citing *E. & J. Gallo Winery v. Spider Webs Ltd.*, 286 F.3d 270, 276 (5th Cir. 2002)).
[99] Opp'n 25.
[100] *See id.* at 25–26.
[101] *Id.* at 27.

domain name for sale in any manner that could implicate liability under existing trademark dilution law."[102] For this reason, some courts have concluded that "there is no requirement under [the sixth factor] that the cybersquatter make a formal offer to sell the domain name."[103] The key question is whether there is sufficient evidence to show that the alleged cybersquatter "uses the domain name in order to procure an offer for purchase of the domain name."[104]

A reasonable fact-finder could infer that Mr. Buchanan used the domain name to obtain valuable offers. The "cloudcover.com" domain is identical to the "CloudCover" mark with the exception of ".com." Mr. Buchanan knew of the "CloudCover" mark at least as early as December 2010 when CloudCover's counsel informed him that the "cloudcover.com" domain was potentially infringing and that CloudCover was willing to purchase it.[105]

Next, there does not need to be evidence of a sale.[106] While no bidder mentioned CloudCover explicitly, the offers to buy the domain—and Mr. Buchanan's invitations for offers—started after the emails warning of possible trademark infringement.[107] Over the next ten years, Mr. Buchanan apparently received eight offers to purchase the domain from six potential buyers, including ones contracted by CloudCover.[108] In most cases, Mr. Buchanan stated that he had not moved forward with his project but said that he had no intention of selling. Still, he invited the parties to make offers, which he sometimes characterized as too low compared to

---

[102] *E. & J. Gallo Winery*, 286 F.3d at 276 (quoting *Sporty's Farm,* 202 F.3d at 495–96). The court also reasoned that the ACPA was enacted to address situations where a party was "in the 'business' of 'register[ing] trademarks as domain names and then sell[ing] them to the rightful trademark owners." *Id.* (quoting *Panavision Intern., L.P. v. Toeppen,* 141 F.3d 1316, 1325 (9th Cir. 1998)).
[103] *Prudential Ins.*, 546 F. Supp. 3d at 489.
[104] *Id.* (citing *PETA v. Doughney*, 113 F. Supp. 2d 915, 920 (E.D. Va. 2000), *aff'd*, 263 F.3d 359 (4th Cir. 2001)).
[105] *See* Albright Email.
[106] 15 U.S.C. § 1125(d)(1)(B)(VI).
[107] *See* Albright Email; Buchanan Email.
[108] *See* Exs. H, I, J, K, M, N, P, Minster Decl.

money spent in obtaining and protecting the domain. For example, he said that a $500 offer in October 2014 was "not anywhere close to what we've invested in the domain and project"[109] and he stated in early 2016 that he had invested more than $20,000 in the domain.[110] Yet he confirmed that as of early 2016, his expenses for the domain had been about $3,746.[111]

The record suggests that Mr. Buchanan took little or no concrete actions to further his project. His deposition essentially confirms the twenty-year lack of progress in the software-as-a-service project.[112] As of March 2022, Mr. Buchanan had not taken any of the following actions: registering "cloudcover"-related marks,[113] filing patents,[114] registering business entities to manage his service,[115] developing software related to launching the business,[116] hiring personnel to develop software,[117] contacting potential donors to fund patents for associated technology,[118] or creating a formal business plan.[119] Even so, the absence of progress did not stop Mr. Buchanan from maintaining the domain name and inviting offers.[120]

The only evidence to the contrary would come from Mr. Buchanan. Generally, when an issue turns in large measure on witness credibility, "the trier of the facts should have the

---

[109] Ex. H, Minster Decl.
[110] *See* Buchanan Dep. 30:3–10.
[111] *Id.* at 55:3–22.
[112] *Id.* at 20:14–23:15.
[113] *Id.* at 26:4–7; 73:19–74:3.
[114] *Id.* at 44:4–6.
[115] *Id.* at 67:23–68:4.
[116] *Id.* at 42:20–43:2.
[117] *Id.* at 43:3–15.
[118] *Id.* at 44:7–12. Mr. Buchanan later stated in his deposition that he planned to self-finance the project. *Id.* at 43:20–44:3.
[119] *Id.* at 43:16–19.
[120] See *ZP No. 314, LLC v. ILM Cap., LLC*, 335 F. Supp. 3d 1242, 1263–64 (S.D. Ala. 2018) (concluding that while the defendants' actions in passively holding the domain "may not, alone, evince an intent to profit, . . . when taken together with the other circumstances of this case, including the fact that [the defendants] intended to hold onto the domain names for *potential future use in their business operations*, such could reasonably suggest a bad faith intent to profit from the . . . re-registration of the domain").

opportunity to evaluate their credibility by observing their demeanor while they testify."[121] "Only through *live* cross-examination can the fact-finder observe the demeanor of a witness, and assess his credibility."[122] Indeed, questions of a party's intent and motive are often "particularly inappropriate for summary judgment disposition."[123]

Mr. Buchanan contends that CloudCover has no direct evidence in support of its claims.[124] It is true that "discredited testimony is not [normally] considered a sufficient basis for drawing a contrary conclusion."[125] "[T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment."[126] However, "[w]here the plaintiff must prove the defendant's intent by circumstantial evidence, summary judgment is rarely appropriate."[127] Such is the case here.

Additionally, Mr. Buchanan argues that CloudCover must tie a potential sale of cloudcover.com to its use of the relevant mark. He argues that the trademarks for "CLOUD COVER," "CLOUDCOVER MUSIC," and "DRY CLOUD COVERS"—marks for protective foliage spray, beer, software for music and entertainment services, and fitted bed sheets—show that the words "cloud" and "cover" have trademark significance apart from CloudCover's sites.[128] Further, Mr. Buchanan argues that CloudCover cannot show that his domain represents a

---

[121] *C.S. Hammond & Co. v. Int'l Coll. Globe Inc.*, 146 F. Supp. 514, 516 (S.D.N.Y. 1956) (citing S*artor v. Ark. Nat. Gas Co.*, 321 U.S. 620 (1943)).
[122] *Int'l Shortstop*, 939 F.2d at 1265.
[123] *Romero v. Union Pac. R.R.*, 615 F.2d 1303, 1309 (10th Cir. 1980); *see Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) ("Questions of intent involve many intangible factors, such as witness credibility, that are best left to the consideration of a factfinder after a full trial.").
[124] Reply 4.
[125] *Anderson*, 477 U.S. at 256–57 (quoting *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 512 (1984)).
[126] *Id.* at 257.
[127] *Pulsecard, Inc. v. Discover Card Servs., Inc.*, No. CIV. A. 94-2304, 1996 WL 137824, at *5 (D. Kan. Mar. 22, 1996) (citation omitted).
[128] *See* Decl. of Adam D. Stevens ¶ 4, Ex. Q, ECF No. 41-1, filed Nov. 28, 2022; Ex. R, ECF No. 41-2, filed Nov. 28, 2022. As Mr. Buchanan also argues, the words "cloud" and "cover" are "everyday words in the English

per se bad faith intent to profit from the "CloudCover" mark."[129] He contends that there can be no showing of an intent to profit from the mark because CloudCover fails to show a factual nexus between its trademark rights and the "cloudcover.com" domain.[130]

CloudCover has offered enough for a reasonable juror to find a nexus. The issue is over the "cloudcover.com" domain and CloudCover's marks—not any other federal trademark. Viewing "cloudcover.com" next to the mark "CloudCover" shows that they are virtually identical. "The ACPA requires a comparison solely of the mark and the allegedly infringing domain names in order to determine whether they 'are so similar in sight, sound or meaning that confusion is likely.'"[131] "The comparison considers the 'secondary domain name'—i.e., the text of the site's name—without regard for the 'top level domain name' (.com, .net, etc.) or for any differences in capitalization (because domain names use only lowercase letters)."[132]

Thus, given the evidence, a reasonable jury could conclude that Mr. Buchanan intended to profit from the domain name while having no intent to use it for a bona fide purpose.

### D. Other ACPA Factors

There are seven additional ACPA factors to help inform whether a party has a bad faith intent to profit from a mark. Factors seven through nine—false contact information at registration, multiple domain names, and incorporation of a famous mark—are inapplicable

---

language" and therefore "must available for public use, including in domain names that do not impact the trademark significance of CloudCover's mark." Reply 7 (citing Ex. S, ECF No. 41-1, filed Nov. 28, 2022).
[129] Reply 7.
[130] *Id.* at 6–8.
[131] *Boigris v. EWC P&T, LLC*, 7 F.4th 1079, 1085 (11th Cir. 2021) (citation omitted); *see* 5 McCarthy on Trademarks and Unfair Competition § 25A:51 & n.9 (5th ed.) ("It is only the challenged domain name and the plaintiff's mark that are to be compared to determine if the accused domain name is confusingly similar." (citing *Newport News Holdings*, 650 F.3d at 436–37))).
[132] *Boigris*, 7 F.4th at 1085 (quoting *Sporty's Farm*, 202 F.3d at 497–98).

here.[133] As to the first four factors, CloudCover asserts that they are not present and thus the "finding . . . weighs *in favor of* a finding [of] bad faith."[134]

The first factor is whether an alleged cybersquatter has any trademarks or IP rights in the domain name.[135] Mr. Buchanan admits in his deposition that he has never filed any trademark or copyright applications related to cloudcover.com.[136] The second factor asks whether the domain name consists of the name of a person.[137] Mr. Buchanan stated that cloudcover.com did not relate to a person's legal name.[138] The third factor is a party's prior use of the domain name in connection with an offering of goods or services.[139] Mr. Buchanan avers that he has done nothing other than registration to get the software-as-a-service project "off the ground."[140] As such, Mr. Buchanan has not so far used the "cloudcover.com" domain "in connection with the bona fide offering of any goods or services."[141] For the same reason, the fourth factor is not present: to date, Mr. Buchanan has not made "bona fide noncommercial or fair use of the mark in a site accessible under the domain name" for purposes of the fourth factor.[142]

Mr. Buchanan argues, however, that "[t]he absence of such factors . . . is not any real evidence of bad faith, as they may be similarly absent in any case where [he] . . . has not yet had an opportunity to use the domain name."[143] It may be true that Mr. Buchanan may one day use the domain name to apply for a trademark or to use it for a bona fide offering of goods or

---

[133] 15 U.S.C. § 1125(d)(1)(B)(VII)–(IX).
[134] Opp'n 20.
[135] 15 U.S.C. § 1125(d)(1)(B)(I).
[136] Buchanan Dep. 73:18–23.
[137] 15 U.S.C. § 1125(d)(1)(B)(II).
[138] Buchanan Dep. 71:5–10.
[139] 15 U.S.C. § 1125(d)(1)(B)(III).
[140] Buchanan Dep. 26:4–7.
[141] 15 U.S.C. § 1125(d)(1)(B)(III).
[142] *Id.* § 1125(d)(1)(B)(IV); Buchanan Dep. 26:4–7.
[143] Reply 9.

services.[144] Yet speculative future actions do not negate the fact that Mr. Buchanan has not now satisfied the first four ACPA actors. Their absence, which "have been seen as reasons why a defendant might in good faith have registered a domain name incorporating someone else's mark," thus weighs in favor of a juror's ability to find a bad faith intent to profit.[145] As does the fact that it has been twenty years since Mr. Buchanan first registered the domain, yet he has done very little to advance his stated use for it. A reasonable jury could infer bad faith from this.

Given the totality of the circumstances, the court cannot find as a matter of law that Mr. Buchanan did not act with a bad faith intent to profit from the "CloudCover" mark. For this reason, the matter is properly left for the fact-finder's determination at trial.

## ORDER

Accordingly, the court DENIES Defendant's Motion for Summary Judgment.[146]

Signed January 4, 2023.

BY THE COURT

_____
David Barlow
United States District Judge

---

[144] *See* Buchanan Dep. 27:5–11 (discussing that Mr. Buchanan intends to pursue the project and go into business).
[145] *Coca-Cola Co. v. Purdy*, 382 F.3d 774, 785 (8th Cir. 2004); *see also United Artists Corp. v. United Artist Studios LLC*, No. CV 19-828, 2020 WL 4369778, at *15 (C.D. Cal. July 7, 2020) (citing 5 McCarthy on Trademarks and Unfair Competition § 25A:53).
[146] ECF No. 37.